IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| UNITED STATE OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | Case No. 08-CR-016-JHP |
| SAMMY BEAVER, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the Court is Defendant Sammy Beaver's Motion to Suppress (Docket No. 22). For the reasons set forth below, the motion is GRANTED.

## BACKGROUND

**A.   Factual Background**

The Defendant, Sammy Beaver, is a 38 year old Native American man. He is short (5'6") and slightly built (135 pounds). He is largely uneducated, having only been schooled through the sixth grade. Because of this, he can read and write, but "not too good." He has a moderate criminal record, including once being charged with escape from lawful custody.

In January 2004, a nine year old girl told Cherokee County authorities that the Defendant had molested her. Because the molestation was alleged to have occurred within Indian Country, the case was assigned to the Federal Bureau of Investigation. The FBI began an investigation into the allegations. At some point in the investigation, the FBI conducted a consensual interview with the Defendant regarding the allegations. The Defendant denied having molested his accuser.

On February 13, 2008, a grand jury in the Eastern District of Oklahoma indicted the

1

Defendant on six counts of aggravated sexual abuse with a child. Five of the counts alleged the Defendant abused the original accuser from December 2003 to March 2004, the sixth count alleged a similar crime during the same time period against a different child. Armed with an arrest warrant, the FBI began to look for the Defendant.

Assigned to the case was a relatively inexperienced FBI Special Agent by the name of Doug Franks.[1] Agent Franks knew the Defendant worked at Greenleaf Nursery in Park Hill, Oklahoma. Agent Franks attempted to arrest the Defendant at Greenleaf on two occasions, but the Defendant missed work on the days Agent Franks was prepared to arrest the Defendant. Cherokee Nation deputies had tried to arrest the Defendant one day when he *was* at work, but the Defendant fled Greenleaf on foot when the deputies arrived. Then, Agent Franks learned from Greg West—Greenleaf's human resources director—that the Defendant would be at work on February 20, 2008, to pick up a 401(k) check.

Seeing this as an opportunity to arrest the Defendant, Agent Franks chose to go to Greenleaf on that day. Because of the previous unfruitful days spent at Greenleaf waiting on the Defendant to show, Agent Franks chose to go to Greenleaf alone, so as not to preoccupy more than one agent on what might well be an unproductive mission. Agent Franks knew that if the Defendant actually appeared at Greenleaf that day, FBI Special Agent Mike Beaver—no relation to the Defendant—was in the area and could be called in to assist if necessary.

Agent Franks arrived at Greenleaf Nursery late in the morning on February 20, 2008, and waited for the Defendant in a small office towards the back right of the reception area at Greenleaf.

---

[1] Approximately twelve months out of the academy at the time, Agent Franks had served four years in the United States Navy prior to joining the FBI, and had obtained a master degree in science and information systems, as well as a master of business administration, from Baylor University. Similar in size and stature to the Defendant, Agent Franks is 5'8" tall and weighs 138 pounds.

The office had a window, but Agent Franks kept the blinds drawn so that the Defendant would not be alerted to Agent Franks' presence. After a few hours, the Defendant arrived. Although the blinds were drawn, Agent Franks was able to see the Defendant walk into Greg West's office.

Agent Franks was concerned the Defendant might "decid[e] to fight" so he called Agent Beaver to come assist. Agent Franks hoped that Agent Beaver would arrive before the Defendant tried to leave, and Agent Beaver did in fact arrive right as the Defendant was leaving. As the Defendant walked out of West's office, Agent Franks put his hands on the Defendant's arms and said "Sammy, you're not going anywhere. You need to come talk to me." Agent Franks and Agent Beaver handcuffed the Defendant behind his back and led him to the office that Agent Franks had used as a hiding place. At some point around this time, Agent Beaver—who apparently has a history of being aggressive and confrontational—pointed his finger in the Defendant's face and accused him of being "cocky" and said "You lied to me before and now look what happened to you, you're under arrest"[2]

The office was 12 foot by 15 foot. Inside the office was a desk with a computer and phone, three chairs, and a writing-board. The office was "comfortable" with heating/air conditioning and a restroom located nearby. The blinds on the window remained drawn.

Agent Franks and Agent Beaver moved the Defendant's handcuffs to the front, sat the Defendant down, and told him they had a warrant for his arrest. Neither agent had a *Miranda* warning form with them, so the agents called the Cherokee Marshal's Office and asked for one to be faxed. Agent Franks testified that he told the Defendant that they were not going to talk about

---

[2]When asked at the suppression hearing by defense counsel whether Agent Beaver made this statement in an aggressive, confrontational manner, Agent Franks responded "compared to how aggressive and confrontational I've seen Mike Beaver before, I would say this was pretty minor."

3

anything until the *Miranda* warning arrived. The *Miranda* form arrived about 10-15 minutes later. Although Defendant said he could read and write the English language and did not appear to be under the influence of any drugs or alcohol or suffering from any mental or physical disability, Agent Franks knew that Defendant had a limited education and Agent Franks thought it best to read the waiver to Defendant. After being read the warnings, the Defendant verbally acknowledged he understood his rights and signed and initialed the *Miranda* form. The Defendant testified that he did not sign and initial the form until after he had been interrogated.[3] Agent Franks testified to the contrary, saying that "we didn't discuss anything" until the *Miranda* form was received and signed by the Defendant.[4]

After reading the Defendant his rights, Agent Franks and Agent Beaver began to interrogate the Defendant. Pursuant to FBI policy, the interrogation was neither audiotaped nor videotaped. Agent Franks and Agent Beaver immediately began utilizing several of the interrogation techniques they had been taught by the FBI. One technique, isolation of the subject, had already been utilized when Agent Franks and Agent Beaver took the Defendant into the small, closed office at Greenleaf. The agents began the actual interrogation by explaining the nature of the evidence that reflected Defendant's guilt. Agent Franks testified that this technique was designed to frighten the Defendant by demonstrating to him the "overwhelming evidence of [his] guilt."

After isolating the Defendant, and convincing him that the evidence of his guilt was

---

[3]The form indicates it was signed at 1:42 pm. The fax machine time stamp indicates, however, that the document was faxed at 2:32 pm. No explanation was given for this discrepency other that Agent Franks statement that he "can't control what the clock on the fax machine is set to." No testimony was given as to the specific time the interrogation started.

[4]The Defendant has some experience with law enforcement, having been arrested and handcuffed by law enforcement on multiple occasions prior to the instant arrest. He has been given the Miranda warnings on multiple occasions, but prior to February 20, 2008, had never been asked to sign a Miranda warning form.

4

overwhelming, the agents next explained to the Defendant the term of imprisonment he might face if convicted. The agents confronted the Defendant with the indictment, explaining to him that it contained six counts involving vaginal intercourse. Agent Franks told the Defendant that an act of vaginal intercourse would result in a harsher sentence than an act of simple fondling. Agent Franks told the Defendant that "if he came out and told the truth; for example, if he told us that no, he did not have intercourse with them, then the circumstances of what he was charged with would be changed." Agent Franks testified that this technique is know as "minimizing," a technique designed to allow a suspect to "downplay their role in the crime." The agents' hope was that by convincing the Defendant that he would be convicted of the more serious act of vaginal intercourse with the girls, the Defendant might confess to the less serious act of simply fondling the girls.

Having explained to the Defendant how the different charges carried different penalties, the agents then explained to the Defendant the specific range of punishment the Defendant was facing. Agent Franks gave a cursory, and partially incorrect, explanation of the United States Sentencing Guidelines to the Defendant. Agent Franks, who testified that he was trained by the FBI in how to calculate a sentence under the guidelines, told Sammy that "there's typically a range of punishments available. Certain factors, such as the age of the victim, the circumstances of the crime, could make that punishment greater. Certain factors, such as the victim's culpability or taking responsibility to express remorse, could make the range of punishment less."[5]

Turning to the chalkboard in the office, Agent Beaver wrote two numbers. At the top of the chalkboard Agent Beaver wrote "30 years," a number that Agents Franks said represented the

---

[5]The Defendant testified that he assumed Agent Franks knew what he was talking about "since he was an FBI agent."Agent Franks acknowledged at the suppression hearing that his representation to the Defendant that the "victim's culpability" was a relevant factor under the guidelines was a legally incorrect statement.

maximum punishment that the Defendant could receive if convicted of all six counts contained in the indictment. The Defendant testified that Agent Beaver then wrote at the bottom of the chalkboard a number that Agent Franks said represented the punishment the Defendant could receive if he confessed. The Defendant testified that the agents told him that if he confessed he would only go to prison for "ten, fifteen months." Agent Franks couldn't recall "if anything was written at the bottom of the board...[] other than there was a number at the top of the board, thirty years, and then a line drawn down."[6] Agent Franks said that in writing these number(s) on the chalkboard the agents were "making a fact known of the range of punishment."

By the time the agents had finished, the Defendant was very apprehensive. The Defendant testified that he did not believe Agent Franks when Agent Franks told him that if he confessed, "then the circumstances of what he was charged with would be changed." According to the Defendant, Agent Franks told him that if he confessed, "they would drop it down to two counts." The Defendant claims he asked, "is that a deal for real?," to which Agent Franks said "yeah" and they "shook on it." According to Agent Franks, the handshake did take place, but only to assure the Defendant that "he could receive consideration from the judge if he told the truth."

At this point, satisfied with the handshake he had received from Agent Franks, the Defendant

---

[6]Agent Franks' testimony on this point was inconsistent. At one point in the questioning he was asked:

> Q. And additionally, there was written on the bottom of the board a lower range of punishment; true?
>
> A. I don't recall what the lower range of punishment was.
>
> Q. I'm not asking you what it was. I'm asking – or I'm saying, it was written on the bottom of the board what the lower range of punishment was; true?
>
> A. True.

(Tr. of Hr'g, Pg. 36, Ln. 16-24). It was only later that Agent Franks changed his testimony to reflect that he did not recall "if anything" was written at the bottom of the board.

6

said "do you want to know the truth and what really happened?" The Defendant then proceeded to confess to fondling the two girls named in the indictment, but denied having intercourse with them. Agent Beaver took notes as Sammy spoke. When the Defendant was finished, the agents asked some clarifying questions and then read back Agent Beaver's notes, asking the Defendant if they were accurate. The Defendant signed the notes acknowledging they were accurate, but never read the notes, which are barely legible.

This interrogation lasted approximately one hour. After confessing, the Defendant was transported from the nursery to a detention facility. The Defendant is currently charged with all six counts originally contained in the indictment—no counts have been modified or dropped.

**B.     Procedural Background**

The instant motion was filed March 12, 2008. The Court held a hearing on the motion on March 27, 2008, hearing testimony from Special Agent Doug Franks of the Federal Bureau of Investigation, the Defendant, and Greg West, human resources director at the business where Defendant was employed at the time of his arrest.

In his motion, Defendant seeks to suppress the incriminating statements he made during the post-arrest interrogation of February 20, 2008. Defendant argues the motion should be granted based on: (1) the Government's failure to prove that Defendant made a knowing and timely waiver of his *Miranda* rights, and (2) the Government's coercion of Defendant's confession. The Government argues that Defendant was properly informed of his rights, and then voluntarily made the incriminating statements, rendering suppression improper.

The Court addresses Defendant's second contention first.

## **DISCUSSION**

## A. Standards for Evaluating the Voluntariness of the Confession

When a defendant challenges the voluntariness of a confession, the prosecution bears the burden of proving by a preponderance of the evidence the voluntariness of the confession. *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

The voluntariness of a confession is determined by considering the totality of the circumstances in which it was made. *Schneckloth v. Bustamante*, 412 U.S. 218, 226 (1973). In every case, the Court must determine the factual circumstances surrounding the confession, assess the psychological impact on the accused, and evaluate the legal significance of how the accused reacted. *Id.* (citing *Columbe vs. Connecticut*, 367 U.S. 568, 603 (1961))[7]. In determining that legal significance, the Court must ask:

> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*United States vs. Perdue*, 8 F.3d 1455, 1466 (10th Cir. 1993) (quoting *Columbe vs. Connecticut*, 367 U.S. 568, 602 (1961)).

Here, the main thrust of Defendant's argument is that he was induced to confess by the interrogating agents' promises of leniency.[8] While such promises were once thought to render a confession *per se* inadmissible, *United States v. Bram*, 168 U.S. 532 (1897), courts have since retreated from that view and now simply look at promises of leniency as matters to be evaluated in

---

[7] The Court would note that the Government's brief cites to 18 U.S.C. § 3501(b). While that statute may be illustrative of certain factors that may be relevant to the Court's voluntariness inquiry, the statute was, of course, found to be unconstitutional in *Dickerson v. United States*, 530 U.S. 428 (2000). *See also United States v. Bustillos-Munoz*, 235 F.3d 505, 516 (10th Cir. 2000).

[8] The Court recognizes that there is little clarity in this area of the law. Paul Marcus, *It's Not Just About Miranda: Determining the Voluntariness of Confessions in Criminal Prosecutions*, 40 Val. U. L. Rev. 601, 623 (2006).

the totality of the circumstances. *United States v. Dowell*, 430 F.3d 1100, 1108 (10th Cir. 2005).[9]

In *United States v. Garot*, the Tenth Circuit identified the following non-exhaustive list of factors as relevant in determining whether a confession was unconstitutionally coerced by a promise of leniency: (1) was an express or implied promise of lenience made to the defendant?; (2) if no promise of lenience was made, did the defendant reasonably believe that such a promise had been made?; (3) was the defendant's statement induced by either the promise or his reasonable belief that a promise had been made?; and (4) was the inducive promise coercive? 801 F.2d 1241, 1244 (10th Cir.1986)

The Court looks to these factors, as well as all others it finds relevant, to determine whether Defendant's confession was given voluntarily.

**1.    Was an express or implied promise of lenience made to the Defendant?**

Based upon the testimony of Agent Franks at the suppression hearing, where Agent Franks testified that he never made any promises to the Defendant, and in fact told the Defendant that his sentence would be decided by a judge, the Court cannot conclude that Agent Franks made an express promise of lenience to the Defendant.[10]

The question of whether an implied promise was made is much closer. While Agent Franks testified that the agents "were very scrupulous to inform [the Defendant] that we could not promise him anything," the agents' goal undoubtedly was to convince the Defendant that he would receive

---

[9]The Court would note that Defendant's motion contains a reference to *United States v. Bram*, 168 U.S. 532 (1897), and that case's statement that "direct or implied promises, however slight" render a confession involuntary. Although Defendant refers to *Bram* as "still cited as controlling precedent on the voluntariness of confessions," that is simply not the case. As early as 1991, the Supreme Court had recognized that, "under current precedent," the quoted passage from *Bram* "does not state the standard for determining the voluntariness of a confession." *Arizona v. Fulminante*, 499 U.S. 279, 285 (1991); *see also Rogers v. Richmond*, 365 U.S. 534, 544 (1961)

[10]There is, of course, a factual dispute as to this point. This factual dispute could easily be resolved had the agents' simply audiotaped the interrogation. Regrettably, FBI policy prevented that from happening.

9

a lighter sentence should he confess, therefore convincing him that confession was his only alternative. While the agents may have told the Defendant that they could not guarantee a lighter sentence, they certainly implied that a lighter sentence would result should the Defendant confess.

The Court's conclusion here is guided by *United States v. Lopez*, 437 F.3d 1059 (10th Cir. 2006). In *Lopez,* the defendant Lopez was accused of shooting another man after an altercation outside of a party. Because the shooting occurred in Indian Country, FBI agents investigated the crime. Agents identified Lopez as the prime suspect and arrested him. Those agents then interrogated Lopez:

> Agent Hopper [] took two pieces of paper and wrote the words "mistake" and "murder" on them and asked Lopez whether his killing Box was an accident or intentional murder. Agent Hopper then asked Lopez to make a choice. The agent took two more pieces of paper and wrote the numbers six and sixty on them. Lopez testified that Agent Hopper told him "if you cooperate, you know, ... you could be looking at six years. And if you don't cooperate and give us answers, you could be looking at 60 years."
>
> Agent Hopper also told Lopez about a murder case in which the suspects had cooperated and gotten less time than the suspects who had not cooperated. According to the agent, the suspects in that other case were "treated leniently" because the crime had been a mistake.
>
> At 10:18 p.m., over an hour into the second interview, a crying Lopez told the agents that he had shot Box by mistake.

*Id.* at 1061-62. The district court suppressed Lopez's confession. On appeal, the Tenth Circuit closely scrutinized the agent's writing down of possible punishments:

> The most troublesome detail about the interrogation is Agent Hopper's use of the pieces of paper marked with the terms "murder," "mistake," "60," and "6." The district court found that Agent Hopper's use of these papers amounted to a promise of leniency.
>
> The message that Hopper intended to convey from these sheets of paper is clear-Hopper used these sheets of paper to inform [Lopez] that if he stated that his alleged actions were a mistake, he would get six years in prison. On the other hand,

10

> if [Lopez] did not confess and explain that his actions were the result of a mistake, he would face sixty years in prison.... [T]his is not a vague and non-committal promise.... Rather, it is a promise that [Lopez] will spend fifty-four fewer years in prison if he confesses.

*Id.* at 1064. Based on this, and other factors, the Tenth Circuit affirmed, finding the confession to have been coerced by a promise of leniency. *Id.* at 1066.

Based on *Lopez,* this Court must conclude that Agent Franks and Agent Beaver's actions in this case — which are strikingly similar to *Lopez* — amounted to a promise of leniency.

### 2. Did the Defendant reasonably believe that such a promise had been made?

The Defendant clearly formulated the reasonable belief that the agents were promising him a reduction in the number of counts charged and a lighter sentence if he confessed to fondling the girls. Of particular importance is the Defendant's insistence that Agent Frank's shake his hand. It is clear that Defendant thought a deal had been struck and wanted this handshake to memorialize the deal, a deal that he described as being the agents' agreement to drop all but two counts contained within the indictment. As a result of these circumstances, the Court is convinced the Defendant believed he had been promised lenience. And based on the Court's conclusion that a promise of leniency had been made, the Defendant's belief that such a promise had been made was, of course, reasonable.

### 3. Was the Defendant's statement induced by either the promise or his reasonable belief that a promise had been made?

The totality of the testimony heard at the suppression hearing convinces the Court the sole reason the Defendant confessed was because he reasonably believed that he had been promised leniency, and the friendly nature of the "handshake" that occurred between the Defendant and Agent Franks clearly demonstrates the Defendants belief he was to receive leniency:

> Q. Okay. And so there were two sets of numbers on the board; is that what you said?
>
> A. Yes.
>
> Q. And was anything said about the indictment and the counts and number of counts and whether that would change?
>
> A. Yes, they did. They said if I gave out a statement, that – Doug told me if I gave out a statement, then they would drop it to two counts.
>
> Q. After he said that, what happened?
>
> A. Then I gave them my statement.
>
> Q. Did anything happen before you gave a statement? Did you shake anybody's hand?
>
> A. Yes. I did. It was just me and Doug in there in the room, and after he told me that if I gave out a statement, that they would drop it down to two counts, and I told him, "Is that a deal for real," he said, "Yeah." He says, "Mike will be our witness too."
>
> So he called Mike in the room and Mike came in there, and when Mike came in me and Doug shook hands on it.
>
> Q. Were the statements that Mr. Franks made to you, were those the reasons why you made your statement?
>
> A. Yes.

(Tr. of Hr'g, Pg. 64, Ln. 11-25, Pg. 65, Ln. 1-9).

The Court also considers the Defendant's initial denial of the charges when first interviewed by the agents. That fact, when considered together with the unusual context surrounding the Defendant's confession, leads the Court to conclude that the Defendant was encouraged to confess in return for a promise of leniency. Of particular importance is the Defendant's confession to the specific act— fondling—that the agents had informed him carried a lighter sentence than the act of vaginal intercourse, which the Defendant predictably denied. *See Lopez,* 437 F.3d at 1061-62

12

(Defendant confesses to act which interrogating agents had indicated would result in the lightest punishment). This leaves little doubt that Defendant's confession to the act of fondling was induced by the agents' statements regarding the differing penalties for fondling and vaginal intercourse.

**4. Was the inducive promise coercive?**

The Court views the situation the Defendant was placed in as extraordinarily coercive. The Defendant was told that the evidence of his guilt was overwhelming, that he *would* be convicted of all six counts contained in the indictment, and that he *would* likely spend 30 years in prison — something that even Agent Franks admits amounted to an implicit threat towards the Defendant (Tr. of Hr'g, Pg. 36, Ln. 13-15). Defendant was then told that if he just confessed to the lesser crime of fondling, he would likely receive a much lower sentence.[11] Presented with this classic beggar's choice, Defendant certainly felt as though he had no choice but to confess to fondling.

**5. Other Relevant Factors**

The Court is also troubled by the agents' wielding of the United States Sentencing Guidelines as a tool in this interrogation. The parties have not presented, and the Court has not discovered, any case involving this particular type of interrogation technique. The Court therefore takes a fresh look at the constitutional concerns raised by this practice.

First, the Court is concerned that the interrogating agent's use of the sentencing guidelines placed him in the role of giving legal advice to the Defendant, something which the Tenth Circuit has explicitly disapproved. *See Moore v. United States*, 441 F.2d 746, 748 (10th Cir. 1971)("We do not approve of the practice of an interrogating agent undertaking to give legal advice to an

---

[11]Also relevant is the fact that the Defendant was unrepresented by counsel, and the fact that the talk of leniency in exchange for a confession was initiated by the agents. *See United States v. Williams,* 447 F.Supp. 631, 637 (D.C.Del. 1978).

accused."). This is particularly true where an interrogation subject, having been informed of his right to counsel, and having given up that right, is confronted with an agent who is essentially stepping into the role of defense counsel, i.e., explaining how the sentencing guidelines work, calculating the likely sentence, and explaining what factors might cause the likely sentence to be reduced. This a dangerous precedent. Calculating a sentence under the sentencing guidelines is a complicated and daunting tasks. This Court, in its role as a sentencing court, does not attempt to make such calculations without the benefit of an exhaustive pre-sentence investigative report prepared by the United States Probation Office. Even then, a great deal of legal research is often required to determine whether particular guideline provisions that might increase or reduce the guideline range are applicable to the particulars of the case. The Court thinks it impossible for an interrogating FBI agent to arrive at an accurate guideline sentence based on the information known to the agent at the time.[12] But that is exactly what Agent Franks purported to do:

| | |
|---|---|
| A. | I told him that there's typically a range of punishments available. Certain factors, such as the age of the victim, the circumstances of the crime, could make that punishment greater. Certain factors, such as the victim's culpability or taking responsibility to express remorse, could make that range of punishment less. |
| Q. | What do you mean by "the victim's culpability"? |
| A. | Whether the victim had any role within the crime. |
| Q. | That's not true, is it? |
| A. | Not for sexual offenses. |
| Q. | So that was wrong? |

---

[12]For example, the Court attempted to calculate the Defendant's guideline range for purpose of this order so that it could determine whether Agent Franks had misinformed the Defendant as to his guideline range. The Court quickly abandoned its attempt after realizing the futility of such an attempt in the absence of a pre-sentence investigative report.

> A. Yes.
>
> Q. Buy you're allowed to lie to defendants to get statements; true?
>
> A. Yes.

(Tr. of Hr'g, Pg. 40, Ln. 8-25). While Agent Franks was correct in noting that lying regarding matters intrinsic to the facts of the alleged offense *has* often been condoned by courts, lying about matters extrinsic to the facts of the alleged offense, i.e., the legal process, must be viewed with much greater skepticism. *See e.g., Lynumn v.* Illinois,372 U.S. 528 (1963)(suppressing confession made after suspect was lied to by police who told her that her children would be taken away and her welfare cut off if she did not confess); *State v. Kelekolio,* 849 P.2d 58, 72-73 (Haw. 1993)(noting distinction between intrinsic and extrinsic lies).

In this case, the Court is convinced that Agent Franks' untruths regarding the application of the sentencing guidelines were improper. By wielding the sentencing guidelines as a tool of interrogation, and by purporting to explain the application of those guidelines to the highly uneducated Defendant, Agent Franks assumed the role of giving legal advice to the Defendant:

> A. They said that there wasn't no way – there wasn't possibly no way I could get out of these charges because I was already convicted anyway. So they started putting months down, how many months I would do. An on top, I think it said, like, 200 and something months I would do the maximum.
>
> Q. Okay. Were other numbers written?
>
> A. Yeah. Then after that, he said if I gave out a statement, that they would drop it down to, like, ten, fifteen months.
>
> Q. Did you understand where he got those numbers?
>
> A. No, I sure don't. But –
>
> Q. Did he act like he knew what he was talking about?

A.     Yes. I figured he did since he was an FBI agent.

(Tr. of Hr'g, Pg. 63, Ln. 7-23). Having assumed this quasi-attorney role, Agent Franks obligated himself to give truthful information regarding the legal process to the Defendant. Agent Franks' failure to do so deprived the Defendant "of the knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran v. Burbine,* 475 U.S. 412, 424 (1986).

As one might expect, Agent Franks also did not explain to the Defendant the impact that *Booker, Gall,* and *Kimborough* have had on the sentencing guidelines. *See United States v. Booker*, 543 U.S. 220 (2005)(rendering the sentencing guidelines advisory); *Gall v. United States*, 128 S.Ct. 586 (2007)(reaffirming the district court's discretion to sentence outside the guidelines range), and *Kimbrough v. United States*, 128 S.Ct. 558 (2007) (same). Indeed, such an explanation would have been necessary before Agent Franks' presentation to the Defendant regarding the application of the sentencing guidelines could be considered completely accurate. And therein lies the danger in law enforcement officers undertaking this role of explaining to Defendants the nuances of the sentencing guidelines. A task that is daunting for the most skilled of attorneys, becomes all but impossible for a non-attorney. Were the Court to condone this practice, the Court would be condoning the practice of presenting to the vulnerable accused legal advice that is untruthful, faulty, incomplete, or all of the above, and at a time when that vulnerable accused is in desperate need of legal advice that is truthful, accurate, and complete.

Based upon this, and all other relevant circumstances, the Court finds that the Government has failed to meet its burden of proving by a preponderance of the evidence that Defendant voluntarily confessed. Because the Court orders suppression on the grounds the confession was

involuntary, the Court does not reach the question of the timing of the *Miranda* warnings.

## **CONCLUSION**

For the reasons set forth above, Defendant Sammy Beaver's Motion to Suppress (Docket No. 22) is hereby GRANTED.

IT IS SO ORDERED this 18th day of June, 2008.

_____
James H. Payne
United States District Judge
Eastern District of Oklahoma